**PESAPLASTIC, C.A., Plaintiff-Appellee,**

v.

**CINCINNATI MILACRON COMPANY, Defendants,**

**Tedruth Plastics Corporation, Defendants-Appellants,**

**Carton, Nary, Witt & Arvanitis, Contemnor-Appellant.**

**PESAPLASTIC, C.A., Plaintiff-Counterclaim Defendant-Appellee,**

v.

**CINCINNATI MILACRON COMPANY, Defendant-Counterclaim Plaintiff-Appellee,**

**Tedruth Plastics Corporation, Defendant-Appellant,**

**Carton, Nary, Witt & Arvanitis, Contemnor-Appellant.**

Nos. 85–5281, 85–5317.

United States Court of Appeals, Eleventh Circuit.

Sept. 24, 1986.

As Amended Oct. 31, 1986.

Gregory P. Borgognoni, Finley, Kumble, Wagner, Heine, Underberg, Manley & Casey, Miami, Fla., for defendants-appellants.

James E. Tribble, Blackwell, Walker, Gray, Powers, Flick & Hoehl, Diane H. Tutt, Miami, Fla., for Cincinnati Milacron Co.

Henry M. Lloyd, Washington, D.C., for Pesaplastic, C.A.

Before FAY and KRAVITCH, Circuit Judges, and HENLEY*, Senior Circuit Judge.

PER CURIAM:

This is an appeal by the law firm of Carton, Nary, Witt and Arvanitis (the "Law Firm"), and their client Tedruth Plastics Corporation ("Tedruth"), from a post-judgment discovery order and the resulting cost judgments awarding costs and attorneys' fees in favor of Pesaplastic, C.A. ("Pesaplastic") and Cincinnati Milacron Company ("Milacron"). We affirm.

## I.

Pesaplastic instituted this action in the United States District Court for the Southern District of Florida on October 4, 1979, against Tedruth and Milacron alleging fraud, breach of contract and warranties, negligence, and breach of fiduciary responsibility in connection with the sale of a mold used to manufacture plastic pallets.[1] A jury trial commenced on May 24, 1982 before the Honorable Jose A. Gonzalez, Jr. After a three week trial, the jury found Tedruth and co-defendant Milacron jointly and severally liable for compensatory damages in the amount of $1,500,000, and assessed punitive damages of $1,250,000 against Tedruth. Pesaplastic and Milacron thereafter entered into a settlement agreement whereby Milacron paid Pesaplastic $1,215,817.31 in complete satisfaction of the compensatory damages judgment. Milacron then obtained a contribution judgment against Tedruth in the amount of $889,370.36, whereupon Pesaplastic and Milacron (hereinafter collectively referred to as the "judgment creditors") aligned themselves in an effort to execute on their respective judgments.

Efforts to satisfy these judgments were frustrated by virtue of the fact that Cities Service Corporation ("Cities Service") had purchased the assets of Tedruth, and that Tedruth had been liquidated on October 28,

---

* Honorable J. Smith Henley, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

1. For a complete recitation of the facts, *see Pesaplastic, C.A. v. Cincinnati Milacron Co.,* 750 F.2d 1516 (11th Cir.1985).

1981. Pesaplastic was not advised of this, however, until sometime during the course of the trial, by letter dated May 24, 1982, from Tedruth's accountant, Harold Rothman.[2] This letter also stated that Tedruth had had no income or expenses since that date and further, that Tedruth had no assets or liabilities. Accordingly, in an effort to determine where the money from the sale of Tedruth had gone, the judgment creditors applied to the court for discovery in aid of execution of the judgments.

On September 22, 1982, Judge Gonzalez issued an order providing for the deposition of Tedruth, pursuant to the provisions of Fed.R.Civ.P. 30(b)(6).[3] The order further provided that application for additional discovery could be made to the court. On March 11, 1983, the judgment creditors jointly noticed the deposition of Tedruth under Rule 30(b)(6) for the week of April 18, 1983. The notice specified the information that any witness designated pursuant to 30(b)(6) should be prepared to address. This information was to include an itemization of any payments or disbursements received by Ruth Box, the sole shareholder of Tedruth, or by any other members of the Box family, some of whom were officers and/or directors of Tedruth, and the locations and/or dispositions of any such monies or things of value received by the Boxes on behalf of Tedruth.

On April 13, 1983, more than one month after the notice of deposition had been filed, and only three working days before the scheduled week of depositions, counsel for the judgment creditors were advised by the Law Firm that Tedruth would be unable to produce a representative for the depositions because David Box, the "former" president of Tedruth and the person designated pursuant to Rule 30(b)(6), was in Europe on business. With respect to the judgment creditors request for production of specific information, the Law Firm took the position that they intended to limit the subject of the depositions to Tedruth's assets.

On April 20, 1983, the judgment creditors filed a motion to compel Tedruth's compliance with their discovery requests. In support of their motion, the judgment creditors argued that Tedruth waited until the last minute before refusing to comply with the deposition notice which had been pending for more than one month. The judgment creditors also noted that Tedruth could have produced any number of persons to give responsive testimony pursuant to the notice of deposition, including, Theodor[4] and Ruth Box; Tedruth's present and former accountants; and, Jay Herman, a partner of the Law Firm, and the attorney who represented Tedruth in connection with the sale of assets to Cities Service. Instead, it appears that the only person contacted for

---

**2.** Pesaplastic sought to discover Tedruth's financial status as early as 1981, after learning that some form of transfer of interest had occurred between Tedruth and Cities Service. On June 9, 1981, in response to questions regarding the financial status of Tedruth, Douglas Calhoun, a partner at the Law Firm, stated:

> [I]n light of your request, at least to find out who the proper party in the suit is, suffice it to say that the terms of the deal, of the arrangement, between Cities Service and Tedruth Plastics Corporation is merely that the Fesco Division of Cities Service has purchased the assets of Tedruth Plastics Corporation. Tedruth Plastics Corporation is still in existence as a corporation of the State of New Jersey.

He refused, however, to answer questions regarding any plans to dissolve Tedruth, claiming that Pesaplastic had no right to that information.

**3.** Rule 30(b)(6) provides:

> A party may in his notice and in a subpoena name as the deponent a public or private corporation or a partnership or association or governmental agency and describe with reasonable particularity the matters on which examination is requested. In that event, the organization so named shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which he will testify. A subpoena shall advise a non-party organization of its duty to make such a designation. The persons so designated shall testify as to matters known or reasonably available to the organization. This subdivision (b)(6) does not preclude taking a deposition by any other procedure authorized in these rules.

**4.** We note that Mr. Box's name has been inconsistently spelled Theodor or Theodore throughout the record.

these depositions was David Box. Moreover, it is clear that even if David Box had been produced, his testimony would have had to have been supplemented with that of other witnesses, because, by his own admission, he was not involved with the sale of assets to Cities Service and was not familiar with the details of the transaction.[5]

A hearing was held before Judge Gonzalez on April 29, 1983. At this hearing, counsel for the judgment creditors [6] asked the court to order the deposition testimony of specific witnesses because they were concerned that the Law Firm would attempt to produce more inappropriate witnesses, or no witness at all. Although Judge Gonzalez declined to order the depositions of specific individuals pursuant to Rule 30(b)(6), he recognized that these depositions could be taken pursuant to any other procedure authorized by the Federal Rules of Civil Procedure.[7] Henry Lloyd thereupon indicated that the judgment creditors intended to notice certain individuals for deposition. With respect to the specific information sought, Douglas Calhoun, a partner of the Law Firm, took the position that the judgment creditors were not entitled to know what Ruth Box did with money received in connection with the sale of Tedruth to Cities Service.[8] In response, Judge Gonzalez stated, "If Tedruth knows what she did with the money, they are obligated to say, just as anybody else would be obligated to say if asked that question."

After the hearing, Judge Gonzalez issued an order requiring Tedruth and the Law Firm to (1) produce a knowledgeable witness pursuant to Rule 30(b)(6) and the deposition notice of March 11, 1983; and (2) provide responsive post-judgment discovery in the form of document production and interrogatory answers, including, a "written response" identifying the documents being produced in response to the itemized document request. The order also expressly subjected both Tedruth and the Law Firm to the full range of available sanctions for failure to comply with the court's order, or with any legitimate discovery requests made by the judgment creditors.

On May 5, 1983, the judgment creditors issued notices of deposition of Tedruth and of the Law Firm, naming specific members

---

5. In prior discovery, when asked whether all Tedruth's assets had been sold to Cities Service, David Box responded as follows:

> MR. BOX: I can't answer that because I wasn't involved in the transaction.
> MR. CALHOUN [counsel for Tedruth]: Let me move to strike his being incompetent. I don't know whether Mr. Box is aware of the actual details of the transaction. He's not a shareholder of Tedruth Plastics as I understand it.
> MR. BOX: Correct.

Moreover, during the course of pretrial discovery, in a letter confirming his appearance at scheduled depositions, David Box wrote "I honestly have to say, I do not know enough about the subject to fill an hour of discussion."

6. Henry Lloyd, of the Law Firm of Heller & Lloyd, P.C., represented Pesaplastic. Milacron was represented by James Tribble and John Hoehl.

7. The following colloquy took place between Judge Gonzalez and Mr. Lloyd:

> MR. LLOYD: If I may point to the rule itself, the last sentence of 30(b)(6) states, and I quote, "This subdivision (b)(6) does not preclude taking a deposition by other procedure authorized in these rules."
> THE COURT: That is true.

> MR. LLOYD: And the authorities say that as well.
> THE COURT: True. I'm not telling you you can't take the deposition of Mr. Box and Mrs. Box and J.R. Box or whatever, or any of these other people, I'm just telling you you can't do it under Rule 30(b)(6).
> If you want to take Mr. Box's deposition, I guess you can do that, and if he wants to file a motion for order of protection, I suppose he can do that, and we'll deal with it as it comes up.

8. During the course of the hearing, Mr. Calhoun stated the following:

> He [Mr. Lloyd] is entitled to find out what happened in the dissolution, where the assets went, i.e., did they go to Ruth Box, did they go to creditors, who did they go to. He is entitled to that. We'll give him that.... [However,] they are not entitled to find out where Ted Box's bank accounts are, where Ruth Box's bank accounts are, where David Box, Thomas Box's are.
>
> *     *     *     *     *     *
>
> [A]t the time of the depositions I'm not going to allow him [Mr. Lloyd] to turn around and ask what Ruth Box did with the money if she got it.

of the Box family and specific members of the Law Firm,[9] to begin the week of May 31, 1983. In addition, subpoenas were served on the four members of the Law Firm, Jay Herman, Douglas Calhoun, Robert Witt, and George Arvanitis, who were named in the notice of deposition issued to the Law Firm. Thereafter, the Law Firm applied to the United States District Court for the District of New Jersey, for an order suppressing the depositions of the four attorneys. At Ruth Box's request, the Law Firm also sought protective orders for the members of the Box family named in the notice of deposition. In support of their motion, the Law Firm argued that: (1) substantial portions of Law Firm partners' testimony might fall within the attorney-client privilege; (2) David Box was out of the country and would not be back for an extended period of time; (3) the ages of Ruth and Theodor Box were 68 years and 76 years respectively; and (4) the Law Firm anticipated that Tedruth would produce Harold Rothman, an accountant for the company, for the 30(b)(6) deposition.

The motion for suppression of the depositions was heard on May 31, 1983 before the Honorable John W. Bissell. After listening to oral argument for both sides, Judge Bissell concluded that the substance of the motion should have been before Judge Gonzalez. In view of the fact that all the parties were in New Jersey, however, Judge Bissell advised them to "[h]ave the depositions go ahead with regard to the production of documents and the examination of Mr. Rothman, and allow the questions of the other applications for protection to be presented to [Judge Gonzalez]." With respect to the Law Firm partners, Judge Bissell stated "that depositions of attorneys should basically be ... a last resort in the sense that if the requisite information can't be garnered elsewhere."

He also stated that "important competing considerations," namely, the issue of attorney-client privilege, warranted "the issuance of a brief temporary restraint." As to the members of the Box family, Judge Bissell stated that he saw no preclusion with regard to taking their depositions. Indeed, Judge Bissell went on to say:

> [T]his Court feels that the present application for a protective order was indeed so deficient on its merits with regard to [the Boxes] that there was no indication of any propriety in this court for this Court intervening with a temporary restraint to preserve the status quo or any other reason.
>
> Accordingly, no temporary restraint will issue as to the members of the Box family.

It was only after Judge Bissell had ruled, that Mr. Calhoun stated that he did not know whether he could produce any of the Boxes because "some of those individuals may ... be in Europe." Indeed, it is clear that all three Boxes were in fact in Europe at this time.

Attorneys for the judgment creditors remained in New Jersey for three days following the hearing before Judge Bissell. During that time, the deposition of Harold Rothman was taken pursuant to Rule 30(b)(6). Additionally, the Law Firm provided documents in their possession for inspection. Finally, attorneys for the judgment creditors were brought to a plant in Farmingdale, New Jersey, to inspect approximately 400 transfile boxes of former Tedruth documents which were being stored there by Cities Service (the "Farmingdale documents").

On June 7, 1983, the judgment creditors filed a motion for imposition of sanctions against both Tedruth and the Law Firm. Judge Gonzalez heard oral argument on this motion on June 10, 1983.[10] In support

9. The notice of deposition of the Law Firm required the production of four partners of the Law Firm, namely, Jay Herman, Douglas Calhoun, Robert Witt, and George Arvanitis. The notice of deposition of Tedruth required the production of David Box, "allegedly Director and former President;" Theodor Box, "allegedly Director and Chairman;" Ruth Box, "allegedly Director, sole shareholder, and Secretary-Trea-

surer;" and all other officers and/or directors for the period from October 4, 1979 to May 31, 1983; and, all accountants for Tedruth for the same period, including, Harold Rothman.

10. The Law Firm's motion for protective order, which had been before Judge Bissell, was also heard by Judge Gonzalez at this time.

of their motion for sanctions, the judgment creditors argued that Tedruth's Rule 30(b)(6) witness, Harold Rothman, could not provide the information sought. Although the Law Firm had represented that Mr. Rothman was the accountant for Tedruth at the time of the sale of assets, in fact, he proved not to have been. Accordingly, Mr. Rothman could provide no first-hand knowledge of the details of the sale of assets to Cities Service.[11] In addition, he had no knowledge of how the sale price for Tedruth was arrived at; what Tedruth did with any money it received; what the Boxes did with any money or items of value they received; or whether any disbursements were actually made. Moreover, it is clear that the Law Firm made no effort to ascertain whether Mr. Rothman was competent to testify regarding the subject matter contained in the notice of deposition.[12]

In further support of their motion, the judgment creditors argued that Tedruth and the Law Firm failed to comply with legitimate requests for document production by failing to provide a "written response" identifying responsive documents, as required by Judge Gonzalez's May 27, 1983 order,[13] and by withholding documents in their possession. Although the documents withheld were claimed to be "privileged," a subsequent *in camera* review of these documents revealed that only approximately 75 documents out of more than 650 were even "arguably" privileged. The judgment creditors also argued that Tedruth and the Law Firm failed to provide complete and responsive answers to the interrogatories[14] set forth in Judge Gonzalez's May 27, 1983 order. Finally, the judgment creditors pointed out that the Law Firm failed to advise the New Jersey court that the Boxes were out of the country until after Judge Bissell ordered that the Boxes be produced for deposition.

It is clear that at the time of this hearing, Judge Gonzalez, who was by then very familiar with the dilatory tactics of Tedruth and the Law Firm, had approached the end of his patience. Thus, at this hearing, Judge Gonzalez stated:

> Mr. Calhoun, explain this to me, please, sir, because I'm not here to be the advocate for Judge Bissell, but I'm embarrassed as a Judge in the Southern District of Florida that a Judge in the District of New Jersey has to stop whatever he has to do and I'm sure he is busy just as all judges are busy, stop what he has to do, take time out, call me on the telephone, interrupt my schedule and his schedule because your law firm files a Motion for Protective Order that is patently frivolous.

\*   \*   \*   \*   \*   \*

11. At the time Mr. Rothman's deposition was taken, the judgment creditors were in possession of a disbursements schedule purporting to list all money and items of value received in connection with the sale of Tedruth. However, since Mr. Rothman had not prepared that list, he was unable to verify its accuracy, and, in fact, was even unable to say who had prepared the list.

12. At the deposition, Mr. Lloyd questioned Mr. Rothman as follows:

Q. Again returning to a previous question of mine, I gather then that neither Mr. Herman nor Mr. Calhoun or anyone, in fact, from the Carton, Nary, Witt & Arvanitis firm went through particular subject areas to see whether you yourself had specific knowledge in terms of subjects to be covered here at this deposition today?

A. I would say that's probably true.

13. In lieu of providing the requisite "written response," the Law Firm provided a list of documents that they were producing. This list, however, did not at all comply with Judge Gonzalez's May 27, 1983 order requiring a written response identifying all documents being produced in response to the judgment creditors document request.

14. For example, although it is clear that attorneys at the Law Firm were in constant contact with Ruth Box with respect to the protective orders sought, they refused to provide a current address for any member of the Box family. Instead, their response was that the Boxes could receive mail in care of the Law Firm. Furthermore, the Law Firm refused to provide a schedule of payments to the Box family or any other person in connection with the sale of Tedruth, as required by Judge Gonzalez's May 27, 1983 order. Instead, the Law Firm responded that that answer would require a review of many of the documents which would be made available for discovery the week of May 31, 1983.

How do you explain the fact that you go into the United States District Court for the District of New Jersey and file a Motion for Protective Order to prevent the taking of the depositions of three individuals and you know that they are not available anyway? You caused the Court to stop. It is time to have a hearing to take testimony. You incur a lot of expense for a lot of people—

*     *     *     *     *     *

Don't you think that candor and your duty as a lawyer would compel you to call that to the attention of Judge Bissell and say, Hey, you know, before we go any further, I think you should know that although the subject matter of this motion has to do with the Box's [sic], the Box's [sic] are not available and, no matter what you decide, Your Honor, it is not going to make a great deal of difference because they are out of the country. That would have saved, you know, some time there in the discussions.

*     *     *     *     *     *

Can I say this most respectfully, I think your law firm and you in connection with that matter that went on in New Jersey have conducted yourselves very unprofessionally. That is the kindest characterization I can place on it.

Accordingly, both Tedruth and the Law Firm were held in contempt [15] and the judgment creditors were awarded attorneys' fees and expenses in connection with the attempted discovery.

Judge Gonzalez also heard a motion for additional discovery at the June 10, 1983 hearing. Without further discovery, the judgment creditors argued, they would be unable to prove where the money from the sale of Tedruth went. Towards this end, the judgment creditors sought production of documents reflecting payments made in connection with the sale of Tedruth. Two groups of documents were involved. First, the Law Firm was in possession of a number of documents. As discussed above, the Law Firm claimed that many of these documents were privileged. Second, the judgment creditors sought discovery of the Farmingdale documents. Although the judgment creditors were given access to these documents when they were in New Jersey, they argued that any meaningful review was precluded by virtue of the fact that the Law Firm failed to segregate and identify the responsive documents.[16] The Law Firm's position was that they should not be required to go through the 400 boxes to segregate and identify each document that was responsive to the original document request. In addition, the document request itself was objected to in that it "was so overbroad and ambiguous that this task would be practically impossible and would be an extreme burden under the circumstances."

The judgment creditors also sought a court order requiring the production of Theodor, Ruth and David Box for deposition.[17] Judge Gonzalez clearly agreed, say-

---

**15.** Tedruth was found in contempt of the prior discovery orders for failure to produce individuals pursuant to 30(b)(6), who had knowledge of the subject matter noticed for deposition. The Law Firm was found in contempt for failure to comply with earlier discovery orders, pursuant to Fed.R.Civ.P. 37(b)(2)(E), which provides in pertinent part:

> [T]he court shall require the party failing to obey the order or the attorney advising him or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

With respect to the Law Firm, Judge Gonzalez explained the reason for the contempt sanction as follows:

> You are the attorney for Tedruth Plastics Corporation. You have the duty of advising them to cooperate. In fact, you have the duty of producing a witness who will testify concerning the matters which are the subject matter of discovery. You have the duty of finding that person and producing them. That is your duty as a lawyer.

**16.** The Law Firm claims that the judgment creditors were provided with a list, prepared by Cities Service, identifying the contents of each box, and that each box was labeled as to its contents.

**17.** In addition, the judgment creditors sought to take the depositions of attorneys Herman, Calhoun, Witt and Arvanitis, pursuant to court order.

ing, "One thing we have to do is depose Mr. Box, Mrs. Box and David Box." Tedruth and the Law Firm's position with respect to taking the depositions of the Box family was two-fold. First, it was argued that the judgment creditors had used the incorrect procedure for taking these depositions, i.e., notice to Tedruth. As non-parties to the lawsuit, and *former* officers and directors of Tedruth, the Boxes could not simply be noticed for deposition; rather, they would have to be subpoenaed. The difficulty with this position was that according to the State of New Jersey, the Boxes continued to be the officers of Tedruth.[18] Indeed, to date, there is no evidence in the record that the Boxes ever ceased to hold their respective offices, i.e., no minutes of meetings or formal resignations have been produced. Secondly, the Law Firm argued that it had no way to compel the Boxes to return to the United States and appear at the depositions; accordingly, it was argued, neither Tedruth nor the Law Firm should be held in contempt for something they were powerless to do.

On January 9, 1984 the district court entered its order finding both Tedruth and the Law Firm in contempt and ordering them "to pay the reasonable expenses, including costs and attorneys' fees," incurred in connection with the hearing before Judge Bissell, the discovery proceedings in New Jersey, and the June 10, 1983 hearing before Judge Gonzalez. The temporary restraining order entered by Judge Bissell on behalf of the members of the Law Firm was terminated, and all applications for protective orders were denied. Tedruth and the Law Firm were ordered to produce the Boxes and certain members of the Law Firm for deposition and the Law Firm was further ordered to produce all documents "in its possession and custody" relating to Tedruth and/or the Boxes. All the foregoing court ordered discovery was sched-

uled to commence on February 1, 1984. Finally, finding that his May 27, 1983 order had not been complied with, Judge Gonzalez again ordered Tedruth and the Law Firm to prepare a "written response" to the judgment creditors document request; provide complete answers to each interrogatory; and serve a written designation of all witnesses to appear for deposition on February 1, 1984, who could and would provide the information required by the May 27, 1983 order.

The Law Firm responded to the district court's order on January 19, 1984, by filing a motion for clarification and modification. In its motion, the Law Firm indicated that it had attempted, and would continue to attempt to persuade the Boxes to appear for deposition, but again took the position that it could not control their actions and should not be held responsible for the Boxes past, and perhaps future failure to appear. In addition, Mr. Herman of the Law Firm informed the court that he had advised Theordor, Ruth and David Box to seek independent counsel. The district court denied the motion for clarification and modification as premature.

On January 20, 1984, the district court entered yet another order pertaining to post-judgment discovery. This order was in response to the judgment creditors' motion of August 23, 1983 seeking to retain the Farmingdale documents in New Jersey. On August 15, 1983, Mr. Calhoun had advised the Law Firm that Cities Service intended to move the Farmingdale documents to Oklahoma no later than August 31, 1983, having sold the plant in New Jersey where those documents were stored. The Law Firm responded to the judgment creditors' motion by saying that it would be impossible for Tedruth or the Law Firm to preserve the documents in New Jersey because they neither owned nor controlled

---

**18.** In a letter to Judge Gonzalez dated June 24, 1983, counsel for the judgment creditors stated that "based upon the last filing with the Secretary of State of New Jersey ... Theodor Box is chairman of the Board, David Box is a Director, and Ruth Box is the Secretary as well as a Director." The letter goes on to say that al-

though Tedruth "had been dissolved for the purposes of Section 337 of the Internal Revenue Code" it "had *not* been dissolved under New Jersey law." Accordingly, they argued, the Boxes could not be considered *former* officers and directors.

these documents. On January 20, 1984, Judge Gonzalez ordered Tedruth to retain the Farmingdale documents at a location no farther than twenty-five miles from the Law Firm's offices in New Jersey,[19] and to advise the court, in advance, of any proposed transfer. In the event that the documents had already been removed, Tedruth and the Law Firm were ordered to provide an affidavit setting forth the complete details of such removal, and to return the documents to New Jersey within five days of the date of the court's order.

In response to the January 20, 1984 order, the Law Firm advised Judge Gonzalez that the Farmingdale documents had been removed to Oklahoma in October, 1983. The Law Firm further stated that although they were attempting to have the documents returned to New Jersey, Cities Service had advised them that the documents could not be released because, at their attorney's instructions, the documents had been put on a "hold" basis as a result of a claim pending against Cities Service.

A second round of post-judgment discovery began pursuant to court order on February 1, 1984. During this round of discovery, Ruth and David Box, and attorneys Herman, Calhoun, Witt and Arvanitis were deposed. However, on the advice of newly retained, independent counsel, Bernard F. Boglioli, Ruth and David Box refused to answer questions regarding the present location of corporate proceeds received in connection with the sale of Tedruth.[20] In addition, Theodor Box, was not produced for deposition. By letter dated January 26, 1984, Mr. Calhoun had notified counsel for the judgment creditors that a heart condition might prevent Theodor Box's appearance at the depositions. Thereafter, on January 30, 1984, the Law Firm wrote to counsel for the judgment creditors and confirmed that Theodor Box was too ill to be deposed. The Law Firm enclosed a copy of the physician's statement regarding Theodor Box's condition and requesting that his deposition be postponed. It was only after arriving in New Jersey, however, that counsel for the judgment creditors learned for the first time that Theodor Box was not in New Jersey, but instead in Switzerland where he had been during the week prior to the depositions.[21]

In addition to the difficulties encountered with respect to the depositions, the judgment creditors efforts to obtain documents were frustrated. First, the Farmingdale documents were not produced, as required by the January 20, 1984 order. Second, the Law Firm withheld numerous documents in its possession on claims of attorney-client privilege or work-product. Although the Law Firm claimed that "all but the most clearly privileged and work product documents were turned over to [counsel for the judgment creditors] for their examination," it is clear from Judge Gonzalez's subsequent *in camera* review, that few of the documents were in fact privileged. *See supra* p. 1515.

On September 11, 1984, the district court entered an order holding Tedruth and the Law Firm in contempt for a second time

---

**19.** In so doing, Judge Gonzalez pointed out that Tedruth and the Law Firm were under a continuing duty to preserve the Farmingdale documents pursuant to the terms of his May 27, 1983 order. Paragraph E of that order provided: "All documents, records, or writings either responsive to this order or to proceedings in execution of judgments shall be preserved."

**20.** The Law Firm argues that Mr. Boglioli, and not the Law Firm, objected to questions pertaining to tracing the assets distributed in connection with the sale of Tedruth. Indeed, the Law Firm clearly stated on the record that they were not instructing the Boxes to not answer questions concerning the location of assets. Thus, the Law Firm sought to make a distinction between itself and Mr. Boglioli, saying:

> When you say counsel here, you do not include me in that. Mr. Boglioli has stated his position on that.

Nevertheless, the Law Firm was under court order to produce certain information and could not relieve itself of the responsibility to provide discovery by substituting Mr. Boglioli as counsel for the Boxes.

**21.** The deposition testimony established that the justification for certain transfers of money to or on behalf of the Boxes is the purported indebtedness of Tedruth to Theodor Box in connection with his patents. Thus it is obvious that Theodor Box's testimony is critical.

for: (1) failure to produce the Farmingdale documents; (2) failure to produce Theodor Box for deposition, and for failure to advise counsel for the judgment creditors that Theodor Box was out of the country on the date scheduled for his deposition; and (3) failure to provide "testimony by Ruth and David Box as to the disposition of monies or other things of value received by them on their behalf." Accordingly, the trial court ordered Tedruth and the Law Firm to pay all reasonable expenses, including costs and attorneys' fees, incurred by the judgment creditors with respect to the February discovery proceedings and the motion for sanctions.[22] The court also ordered Tedruth and the Law Firm to produce for discovery the Farmingdale documents and the allegedly "privileged" documents in the possession of the Law Firm. In addition, attorneys Calhoun and Herman, and Theodor, Ruth, and David Box were to be produced for depositions. The order further provided that the Boxes provide testimony with respect to the disposition of assets received from the sale of Tedruth and all subjects covered by previous discovery orders. Finally, the court entered two cost judgments in favor of the judgment creditors in the combined amount of $48,000.

A final round of discovery took place on October 29, 1984. The Farmingdale documents had been returned to New Jersey and were produced for discovery. However, counsel for the judgment creditors were unable to take the balance of the discovery ordered in the September 11, 1984 discovery order. The Boxes were not produced for deposition, and the depositions of attorneys Calhoun and Herman were deferred because the "privileged" documents in the possession of the Law Firm were not produced. These documents were being considered, *in camera,* by the court with respect to claims of privilege.

On March 4, 1985, in accordance with its September 11, 1984 order, the court entered two cost judgments in favor of the judgment creditors in the combined amount of $39,500. It is from these two costs judgments, and the September 11, 1984 contempt order that Tedruth and the Law Firm take their appeal.

## II.

The main issues presented to this court on appeal are: (1) whether the district court abused its discretion by holding Tedruth and the Law Firm in contempt for failure to comply with its discovery order, and (2) whether the district court denied Tedruth and the Law Firm procedural due process by failing to hold an evidentiary hearing prior to entering the cost judgments against them.

## A.

It is well settled that "the standard of review for an appellate court in considering an appeal of sanctions under Rule 37 is sharply limited to a search for abuse of discretion and a determination that the findings of the trial court are 'fully supported by the record.' " *Carlucci v. Piper Aircraft Corp.,* 775 F.2d 1440, 1447 (11th Cir.1985) (quoting *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 642, 96 S.Ct. 2778, 2780, 49 L.Ed.2d 747 (1976) (per curiam)). Thus, the district court has "broad, although not unbridled, discretion in imposing sanctions" under Rule 37. *Dorey v. Dorey,* 609 F.2d 1128, 1135 (5th Cir.1980).[23] This is especially true when the imposition of monetary sanctions is involved. *Id.* As stated above, the district court identified three reasons for holding Tedruth and the Law Firm in contempt in its September 11, 1984 order, namely, (1) the failure to pro-

---

**22.** In their brief, Tedruth and the Law Firm state that the court also ordered them to pay the reasonable expenses incurred in connection with all future discovery proceedings taken pursuant to court order, without limitation. We, however, interpret the court's language to indicate only that future cost sanctions may be imposed if Tedruth and the Law Firm continue

to refuse to comply with the court's post-judgment discovery order.

**23.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc) we adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

duce the Farmingdale documents; (2) the failure to produce Theodor Box for deposition; and (3) the failure to provide certain testimony at the depositions of Ruth and David Box. *See supra* p. 1519. However, any one of these reasons, if sufficient, would support the imposition of the cost judgments. Accordingly, we proceed to discuss the first basis for the court's order.

▮ As an initial matter, we note that throughout the course of the post-judgment discovery proceedings, Tedruth and the Law Firm have argued that they cannot be held responsible for the failure to produce the Farmingdale documents because they neither own nor control these documents. It is undisputed that the ownership of the Farmingdale documents was transferred to Cities Service in connection with the sale of Tedruth. Thereafter, as an accommodation to the judgment creditors, the documents were retained at the old Tedruth plant in Farmingdale, New Jersey. In October, 1983, because the plant had been sold, Cities Service moved the documents to Tulsa, Oklahoma. Both Tedruth and the Law Firm argue that, by virtue of the fact that they neither owned the documents nor controlled Cities Service, they lacked the means with which to compel Cities Service to retain the documents in New Jersey. This argument, although technically correct, conveniently ignores the realities of the situation.

First, the Law Firm's fees in connection with this litigation are being paid by Cities Service. Accordingly, we are not presented with a situation whereby Cities Service is a complete stranger to these proceedings. Indeed, in view of the fact that Cities Service has agreed to pay the Law Firm's fees, we can assume that they would derive some benefit from the successful conclusion of this litigation. Second, the deposition testimony of Ruth Box reveals that the members of the Law Firm removed some twenty boxes of documents from the Farmingdale plant before the documents were sent to Tulsa, Oklahoma, and stored these documents in Theodor and Ruth Box's attic. It is clear, therefore, that despite Cities Services' ownership of these documents, the members of the Law Firm had

the actual authority, when they chose to exercise it, to selectively remove some of the documents from the shipment, and retain them for their own purposes. Finally, despite the fact that Cities Service had allegedly placed a hold on the Farmingdale documents once they arrived in Oklahoma, after the second order of contempt was entered September 11, 1984, members of the Law Firm were somehow able to immediately secure the return of the documents to New Jersey. Thus we conclude that the appellants' argument with respect to control is meritless.

In addition, the record amply supports the district court's finding of contempt with respect to discovery of the Farmingdale documents. During the June discovery session, counsel for the judgment creditors were brought to the old Tedruth plant in Farmingdale to review documents. When they arrived, they were faced with the prospect of sorting through hundreds of transfile boxes filled with documents since the Law Firm had not identified the responsive documents. Indeed, the Law Firm's only effort to assist counsel for the judgment creditors was to offer to allow Mr. Herman to sort through the documents with them. After one and one-half hours of attempting to review the documents, counsel for the judgment creditors gave up.

Thereafter, counsel for the judgment creditors were advised that Cities Service intended to remove the documents to Tulsa, Oklahoma. In response, the judgment creditors filed a motion seeking to retain the documents in New Jersey. In this motion, the judgment creditors stated that they were prepared to share the cost of storing these documents with Tedruth, provided satisfactory document production took place. Nevertheless, despite the filing of this motion, and the court's outstanding order of May 27, 1983, requiring Tedruth and the Law Firm to preserve all documents relevant to the post-judgment discovery proceedings, the documents were shipped to Oklahoma in October, 1983. As stated above, however, the Law Firm selectively removed some of the documents from the shipment to Oklahoma. On Janu-

ary 20, 1984, the district court entered an order requiring Tedruth and the Law Firm to return any documents which may have been removed from New Jersey. Thereafter, on September 11, 1984, the district court imposed sanctions on Tedruth and the Law Firm, finding them in contempt for failure to obey the January 20, 1984 order. The March 4, 1985 cost judgments were entered pursuant to the court's September order.

■ Tedruth and the Law Firm argue that although they expended great effort in attempting to persuade Cities Service to return the documents in accordance with the court's January 20, 1984 order, they were powerless to secure their immediate return because they belonged to, and were in the possession and control of Cities Service at all times subsequent to October, 1981. Accordingly, they take the position that compliance with the court's January 20, 1984 order was impossible. A party held in contempt may defend his failure to obey a court's order on the grounds that he was unable to comply. *United States v. Hayes,* 722 F.2d 723, 725 (11th Cir.1984). *See also United States v. Asay,* 614 F.2d 655, 660 (9th Cir.1980) ("Inability to comply with an order is ordinarily a complete defense to a charge of contempt."). "To succeed on this defense, however, the respondent must go beyond a mere assertion of inability and satisfy his burden of production on the point by introducing evidence in support of his claim." *Hayes,* 722 F.2d at 725.

*United States v. Hayes* involved the IRS' attempts to obtain information with respect to certain tax shelters sold and managed by John Hayes. Pursuant to the IRS' request, the district court ordered Hayes to produce certain documents relating to the tax shelters. When Hayes only partially complied with the order, the IRS brought contempt proceedings. At a show cause hearing before the district court, Hayes claimed that he could not produce the documents in question because they were in Switzerland in the possession of his partner, Frederick Thom. Hayes further stated that although he had made two trips to Switzerland to obtain the documents, Thom refused to re-

lease them because of his concern over a separate tax investigation. The district court found that Hayes was not in contempt of court because the evidence showed that Hayes had made " 'some effort' " to comply. In addition, in its findings of fact, the court held that it was not shown that Hayes had any legal means by which to compel Thom to produce the documents, and that Hayes had made " 'substantial good faith efforts' " to comply.

Finding that the district court had used the wrong standard, this court vacated the order and remanded for further consideration. In so doing, we stated:

> Even if the efforts [Hayes] did make were 'substantial,' 'diligent' or 'in good faith,' as the court so characterized them in other sections of its order, the fact that he did not make 'all reasonable efforts,' *United States v. Rizzo,* 539 F.2d [458] at 465 [ (5th Cir.1976) ], establishes that Hayes did not sufficiently rebut the IRS' prima facie showing of contempt. The court's use of a 'some effort' standard for measuring the strength of Hayes' defense was, therefore, an abuse of discretion.

722 F.2d at 725.

■ In *United States v. Asay,* an accounting firm and its president, Clifford H. Asay, Jr., were adjudged in contempt for failure to produce taxpayers' books and records pursuant to an IRS summons. Relying on the advice of counsel, Asay had returned all books and records not prepared by the accounting firm, to the taxpayers, one day before the return date of the summonses. The court held that under the circumstances, Asay could not raise the defense of impossibility. In so doing, the court made clear "that a contempt sanction is not [un]available against one who defeats a summons by relinquishing possession of summoned documents." 614 F.2d at 660. Thus, where the person charged with contempt is responsible for the inability to comply, impossibility is not a defense to the contempt proceedings. *Id.*

■ In the present case, Tedruth and the Law Firm cannot raise the defense of im-

possibility because their own actions were responsible for their subsequent inability to comply. First, even before the documents were removed to Oklahoma, the Law Firm failed to provide meaningful discovery by refusing to identify the responsive documents. Second, despite the fact that Tedruth and the Law Firm argue that they had no control over the documents, certain boxes of those documents were selectively removed from the shipment to Oklahoma. Finally, although Tedruth and the Law Firm argue that they were unable to persuade Cities Service to return the documents, it is clear that as soon as they were held in contempt a second time, immediate arrangements were made for the return of the documents. Thus, the very fact that they were ultimately able to secure the return of the documents suggests that compliance with the court's order was not impossible and that all reasonable efforts were not made in the first instance.

After reviewing the record, we conclude that the district court did not abuse its discretion by holding Tedruth and the Law Firm in contempt and in awarding costs and attorneys' fees.

### B.

Tedruth and the Law Firm also argue that the district court denied them due process of law in entering the cost judgments against them without holding a separate evidentiary hearing. Thus, they argue that in addition to the hearing held on the motion for sanctions, they were entitled to another evidentiary hearing prior to the trial court's entry of the cost judgments. In support of their contention, the appellants cite *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980) (per curiam) for the proposition that notice and an opportunity for a hearing on the record are procedures due before attorneys' fees can be imposed pursuant to Rule 37.

In *Roadway Express*, the Supreme Court stated that attorney's fees "should not be assessed lightly or without fair notice and an opportunity for a hearing on the record." *Id.* at 767, 100 S.Ct. at 2464. (footnote omitted). We read the Court's

language to require the district court to hold a hearing before the sanction of attorneys' fees may be imposed. This requirement is clearly satisfied, however, by the kind of hearing that was held in this case, namely, a hearing on the motion for sanctions, at which both sides are entitled to present arguments as to the propriety and type of sanctions to be awarded. Contrary to the appellants' suggestion, therefore, a separate hearing to determine the amount and scope of fees to be awarded is not required. Rather, due process is afforded where, as here, the parties have an opportunity to present their arguments as to the propriety of sanctions, submit affidavits on the amount of such fees and costs, with an opportunity for the sanctioned party to file a motion challenging said affidavits. *See e.g., United States v. Asay*, 614 F.2d 655 (9th Cir.1980). In the present case, after counsel for the judgment creditors submitted their affidavits, the Law Firm and Tedruth filed extensive memoranda in response to the affidavits. Thereafter, the district court entered cost judgments in amounts less than had been requested by counsel for the judgment creditors. We therefore conclude that the appellants were not denied due process of law.

### III.

In conclusion, we note that the attorneys of the Law Firm have conducted themselves in a manner not befitting officers of the court. It is axiomatic that attorneys owe a duty of candor to the court. Moreover, attorneys also have a duty to deal honestly and fairly with opposing counsel. The attorneys of the Law Firm have clearly failed to fulfill these duties. Indeed, they represent yet another case of attorneys having "'sold out to the client.'" *Carlucci v. Piper Aircraft Corp.*, 775 F.2d 1440, 1454 (11th Cir.1985) (Fay, J., concurring). In so doing, the attorneys of the Law Firm lost sight of the fact that, as members of the bar, and officers of the court, our primary responsibility is not to the client, but to the legal system. Our judicial machinery is dependent upon the full support of all members of the bench and bar. Advo-

cacy does not include "game playing." Conduct such as that engaged in here must not, can not and will not be tolerated.

For the foregoing reasons, the orders of the district court are

AFFIRMED.