9 F.3d 924
 127 Lab.Cas. P 33,043, 27 Fed.R.Serv.3d 1317,
1 Wage & Hour Cas. 2d (BNA) 1335
 Richard WOUTERS, Timothy H. Walker, Karin T. Klause, David
Vity, Janet S. Zoldak, Frank R. Pino, Ranae D. Cerezo, Wade
H. Mallard, Mark R. Bents, David L. Zarker, Stephen G.
Smith, Terry N. Wilkes, Jr., Errol L. Wright, Jr., Rebecca
L. Pickering, Daniel Wouters, Karen S. Jordan, Richard M.
Wilde, Georgene Bailes, Carlton L. Jones, Mark D. Hellstrom,
William Mahneke, James D. Kay, Joseph V. Ferrara, William M.
Godfrey, Moetahar Padellan, Marc Ducote, Shannon K. Walker,
Mark L. Whitlock, and Anne Davis, Plaintiffs-Appellants,
Cross-Appellees,
v.
MARTIN COUNTY, FLORIDA, Defendant-Appellee, Cross-Appellee.
 No. 92-4557.
 United States Court of Appeals,
Eleventh Circuit.
 Dec. 21, 1993.
 
 Ben R. Patterson, Tallahassee, FL, for appellants.
 Joseph J. Mancini, J. David Richeson, Ft. Pierce, FL, for appellee.
 Appeals from the United States District Court for the Southern District of Florida.
 Before FAY and CARNES, Circuit Judges and JOHNSON, Senior Circuit Judge.
 FAY, Circuit Judge:
 
 
 1
 Plaintiffs, employees of the Martin County Department of Public Safety, appeal the district court's dismissal of several plaintiffs, denial of their motion for partial summary judgment, and grant of summary judgment in favor of defendant Martin County on the employees' suit to recover overtime compensation allegedly due to them under the Fair Labor Standards Act of 1938[1] ("FLSA"). We REVERSE the order of dismissal as to fourteen plaintiffs, VACATE the order granting summary judgment, and REMAND for further consideration.
 
 I. BACKGROUND
 A. Facts
 
 2
 Plaintiffs are current or former Emergency Medical Services ("EMS") personnel, working as either paramedics ("PMs") or Emergency Medical Technicians ("EMTs"). Their suit alleges entitlement to overtime compensation for all hours worked in excess of forty per week, pursuant to the FLSA section 7(a). Alternatively, plaintiffs claim that if, as argued by defendant, they fall under any exemption provided by the Act, it should be that for law enforcement officers, entitling them to overtime after forty-three hours of work per week.
 
 
 3
 Instead, defendant classifies plaintiffs as firefighters who fall under the exemption found in the FLSA section 7(k) and are entitled to overtime only after working fifty-three hours in a week. Simultaneously, defendant argues that plaintiffs spend all their time providing emergency medical rescue services, and this work qualifies as law enforcement and fire protection activity under section 7(k) of the FLSA. (R.V5-90-8).
 
 
 4
 Firefighters and EMS personnel comprise the county's emergency response system. EMS personnel work in eleven paramedic stations located throughout the County and in six of the fourteen county fire stations. Typically, plaintiffs respond to emergencies in their assigned ambulances. At one fire station, the paramedic rides to emergencies on the fire truck. Plaintiffs' shifts match the "twenty-four hours on, forty-eight hours off" schedule followed by firefighters.[2]
 
 
 5
 EMS personnel provide emergency treatment to victims of fires, accidents, crimes, hazardous materials incidents, natural disasters and a variety of medical crises. They do not handle routine matters like patient transfers. All working hours are dedicated to emergency response, vehicle or equipment maintenance, training, facility housekeeping, or being available at the station for dispatches to emergencies. EMS personnel do not perform duties unrelated to their EMS work.
 
 
 6
 Firefighters and EMS personnel possess different skills. EMTs and PMs are not necessarily firefighters. However, nearly all firefighters are certified EMTs, trained in extrication techniques, and basic life saving and support procedures. Paramedics have EMT training, but are also certified to administer Advanced Life Support ("ALS").[3] Because neither firefighters nor EMTs may conduct ALS functions, paramedics are regularly jointly dispatched to certain fire protection emergencies. EMTs are also automatically dispatched to these calls because they work in teams with paramedics. Defendant asserts that the county's emergency response effectiveness depends on joint action by the various components of the system.
 
 
 7
 Defendant maintains computerized records on the frequency and nature of calls answered by firefighters and EMS units, and relies on the figures for firefighter responses from 1989 to 1991 in presenting its case. Although defendant maintains that firefighters and EMS personnel may work jointly on many types of calls, the only dispatches that are "clearly joint response" are those involving structure fires, vehicle accidents, and medical assists.[4] (Wolfberg Aff. at 7-8). Based on these figures, Defendant asserts that over half of the 4648 legitimate firefighter calls during the target years were joint responses with EMS workers.[5] The same affiant who provided this explanation of the computer printouts said in deposition that "routine dual responses" also occur for hazardous materials situations and aircraft standby calls. These two additional categories add only seventy-three joint dispatches for 1989, ten for 1990, and fourteen for 1991. The County agrees that approximately 20% of all EMS calls during the target years were unrelated to fire calls. (Wolfberg Depo. at 74.)
 
 
 8
 Plaintiffs also use the county's computer printouts but focus on the figures for EMS dispatches. EMS personnel responded to 26,647 calls from 1989 through 1991. Plaintiffs' calculations result in far higher estimates of non-firefighter related EMS calls than one derives from defendant's figures.[6] One method of calculation accepts the county's focus on the firefighter call breakdown, adding firefighter calls to structure fires, medical assists, vehicle accidents, hazardous situations, and aircraft standbys. This yields a total of 7440 routine EMS dispatches with firefighters. If divided by the total number of EMS calls, even this methodology suggests that only 27.92% of all EMS calls were routine dispatches with firefighters. Thus, according to plaintiffs, 72.08% of the work performed by EMTs falls outside the fire protection category.
 
 
 9
 EMS dual response with police officers takes place for automobile accidents, stabbings, rapes, poisonings, suicide attempts, drownings, gunshot wounds, assaults, dead persons, mentally ill persons and overdoses. (Wolfberg Depo. at 51.) From 1989 through 1991, there were 5872 such calls, representing 22.03% of all EMS dispatches. The total number of police dispatches to these calls was not in the record.
 
 
 10
 Neither party clearly addresses the percentage of EMS calls handled alone, that is, without either police or fire dispatch. We note that by combining the police co-response figure of 22.03% with the firefighter co-response figure of 27.92%, we reach a figure of 49.95% of all EMS calls involving routine dispatch to either police or fire activity. Consequently, it appears that EMS personnel function autonomously in 50% of their calls.[7]
 
 
 11
 Before this litigation, plaintiffs and firefighters were assigned to different divisions; they were subsequently placed in a single Emergency Services Division. EMS personnel and firefighters belong to different unions and have different retirement plans. Different radio frequencies serve the two groups. The record does not reflect whether these dispatch channels emanate from a shared dispatch center. Nor does the record reflect whether police and EMS employees belong to the same union or benefit from shared radio dispatch facilities or frequencies. The record further fails to clarify whether EMS employees' radios can reach firefighter or police channels although transmissions are separate, or the significance of each of these possible links between EMS, police, and firefighter services.
 
 B. Procedural History
 
 12
 During discovery the district court determined that fourteen plaintiffs failed to properly respond to interrogatories despite two court orders directing their compliance. Defendant eventually obtained the answers during plaintiffs' depositions. The court dismissed these plaintiffs from the suit pursuant to defendant's motion for sanctions under Fed.R.Civ.P. 37(b)(2)(C).
 
 
 13
 Plaintiffs filed a motion for partial summary judgment as to liability, and defendant filed a motion for summary judgment. The district court granted defendant's motion finding that as a matter of law the County did not violate the overtime exemption found in 29 U.S.C. Sec. 207(k). Wouters v. Martin County, 793 F.Supp. 310 (S.D.Fla.1992). Plaintiffs allege that the district court erred because (1) the material facts do not show that the paramedics were properly classified under the firefighter exemption; (2) even if the County was entitled to a partial overtime exemption, material facts remain in dispute regarding the type of exemption applicable, and (3) dismissing fourteen plaintiffs for failure to respond properly to interrogatories was an abuse of discretion. The county cross-appeals on the trial court's failure to rule on the issue of the "good faith" defense contained in 29 U.S.C. Sec. 259.
 
 II. STANDARD OF REVIEW
 
 14
 We review a district court's grant of summary judgment de novo. Brown v. Crawford, 906 F.2d 667, 669 (11th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991). The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.' " Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56 advisory committee's note). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).
 
 
 15
 The substantive law identifies which facts are material, and the trial judge ruling on a summary judgment motion evaluates the evidence presented by the substantive evidentiary burden. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 254, 106 S.Ct. 2505, 2510, 2513, 91 L.Ed.2d 202 (1986). Material facts are those that might affect the outcome of the suit under the governing law. Id. at 248, 106 S.Ct. at 2510. The movant carries the burden of establishing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The court must avoid weighing conflicting evidence or making credibility determinations. Anderson, 477 U.S. at 255, 106 S.Ct. at 2514. We review the record and all its inferences in the light most favorable to the nonmoving party. Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir.1992). Where a reasonable trier of fact may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." Barfield v. Brierton, 883 F.2d 923, 933-34 (11th Cir.1989) (citation omitted).
 
 
 16
 We review dismissal of plaintiffs as a sanction for failure to comply with a discovery order under an abuse of discretion standard. United States v. $239,500 in U.S. Currency, 764 F.2d 771, 773 (11th Cir.1985).
 
 III. DISCUSSION
 
 17
 Under section 7(a) of the FLSA, an employer must compensate an employee at an overtime rate for all work performed in excess of forty hours during a workweek.[8] Section 7(k) provides the employer with a partial exemption for employees engaged in fire protection[9] and law enforcement[10] activities. Employers need not compensate these employees for overtime until they work fifty-three and forty-three hours per week respectively.[11] While the FLSA does not specifically address ambulance and rescue service employees working for public agencies, the Code of Federal Regulations explains that if employed by a public agency other than a fire protection or law enforcement agency, the agency may treat them like firefighting or police personnel if "their services are substantially related to [such] activities."[12] Services are substantially related if the ambulance or rescue personnel:
 
 
 18
 (1) have received training in the rescue of fire, crime, and accident victims or firefighters or law enforcement personnel in the performance of their respective duties, and (2) ... are regularly dispatched to fires, crime scenes, riots, natural disasters and accidents.[13]
 
 
 19
 EMS personnel may also fall into the exemption for firefighters or police officers if they "form an integral part of the public agency's fire protection [or law enforcement] activities."[14]
 
 
 20
 Assuming a finding that the ambulance or rescue personnel fall into an exempt category, the employer may nonetheless lose the exemption through application of the "20% rule." Under this rule, an otherwise justified exemption is lost if covered employees work more than 20% of the time on non-exempt activities.[15] The requirement applies to ambulance and rescue service personnel. O'Neal v. Barrow County Bd. of Com'rs, 980 F.2d 674, 680-81 (11th Cir.1993). Nonexempt work is that "which is not performed as an incident to or in conjunction with [the employees'] fire protection or law enforcement activities."[16] This Court has held that work generally benefitting the employer, which employees are required to do while not engaged in activities related to their fire protection or law enforcement duties, is nonexempt work. Id. at 682. Finally we note that exemptions from section 7(a) must be narrowly construed against the employer who bears the burden of proving any exemption. Id. at 677.
 
 
 21
 A. Does the Firefighter or Law Enforcement Standard Apply?
 
 
 22
 We take plaintiffs' second issue first, because it presents a threshold inquiry as to whether the record is sufficient to support summary judgment for either plaintiffs or defendant. Plaintiffs contend that if any section 7(k) exemption applies, it should be that for law enforcement officers, not firefighters.
 
 
 23
 Where ambulance or rescue service employees perform both fire and law enforcement activities, "the applicable standard is the one which applies to the activity in which the employee spends the majority of work time during the work period." 29 C.F.R. Sec. 553.215(a) (emphasis added).[17] The regulation's plain language requires comparison of the number of hours spent in each type of activity instead of the percentage of calls falling into each classification.[18] We are mindful that this analysis may be complicated. The record shows that both police officers and firefighters respond to serious automobile accidents, and that the agency routinely dispatches EMS personnel to provide medical assistance at such scenes. Unless the cars are on fire or there is a danger of explosion, it seems likely that the EMS response is more directly connected to the law enforcement function than to firefighting. Conversely, when both police and firefighters respond to a natural disaster, such as an earthquake that has severed natural gas lines, EMS response may concentrate on treatment related to gas inhalation and burns instead of injuries arising from coincidental building collapse. The parties have not yet addressed such possibilities. Accordingly, we will not decide whether the district court should tally the time spent at accident scenes or natural disasters in the firefighter or police column.[19] Resolution of this issue is best left for the trial court to which the parties may present additional variables for consideration.
 
 
 24
 We vacate the district court's order of summary judgment. The court could not find as a matter of law that plaintiffs fell into either the firefighter or police officer exemption for overtime pay after forty hours of work because the inquiry did not first address the material fact of the number of hours spent in each type of exempt activity.
 
 B. The "Good Faith" Defense
 
 25
 The district court granted defendant's motion for summary judgment, rendering moot the good faith issue raised by defendant.[20] Wouters, 793 F.Supp. at 314. Because we vacate the order granting summary judgment, the good faith issue remains open on remand.
 
 C. The "Substantially Related" Standard
 
 26
 Because our opinion in O'Neal followed the district court's order, we take this opportunity to address several other issues that will be considered on remand.
 
 
 27
 In the instant case, the district court granted defendant's motion for summary judgment based on application of the "substantially related" standard. Use of this standard is predicated on a determination that plaintiffs are employed by a "public agency other than a fire protection or law enforcement agency." 29 C.F.R. Sec. 553.215(a) (1993) (emphasis added). The trial court apparently deemed the pre-suit agency structure, in which plaintiffs and firefighters were in separate divisions, determinative in deciding whether to apply section 553.215(a). On remand, the court should specifically address two underlying issues: first, if the threshold inquiry discussed above focuses the remaining dispute on firefighter instead of law enforcement activities, what is the impact of the divisions' consolidation on applicability of this section; and second, if plaintiffs' work is to be evaluated for exemption based on law enforcement activities, does section 553.215 control the outcome?
 
 
 28
 If section 553.215(a) controls the analysis, the standard has two components: first, whether EMS personnel are "trained in rescue," and second, whether they are "regularly dispatched" to certain scenes. We agree with the district court that plaintiffs are "trained in rescue," Wouters, 793 F.Supp. at 314, thereby satisfying the first prong of the test whether evaluation is for the law enforcement or firefighter exemption. In light of our recent decision in O'Neal, we cannot agree with the district court's approach on the "regularly dispatched" prong of the substantially related inquiry.
 
 
 29
 In O'Neal we described the following factors to be considered when deciding if the employer regularly dispatches EMS personnel to either firefighter or law enforcement scenes:
 
 
 30
 (1) the percentage of the [EMS] Service's total calls that are dispatches to fires, crimes, and automobile accidents; (2) the percentage of total EMT man-hours spent responding to dispatches to fires, crimes, and automobile accidents; and (3) the percentage of the total number of all fires, automobile accident, and police calls that occur throughout the county to which the Service is dispatched.
 
 
 31
 O'Neal, 980 F.2d at 679. In keeping with the precise language of section 553.215(a)(2), we added that EMS response to riots and natural disasters should also be considered where supported by the facts. Id. at n. 18.
 
 
 32
 On remand, after deciding if the employer correctly places plaintiffs in an exempt status under section 553.215(a), the "regularly dispatched" inquiry must first focus on the percentage of total EMS calls, not firefighter or police officer calls, which are dispatches in the applicable categories. We do not decide what percentage of calls satisfies the regularly dispatched requirement, see O'Neal, 980 F.2d at 680, but emphasize that this is only one factor in the analysis. Regarding the second prong, we find no reference in the record to the total number of EMS hours spent on regular joint responses with either police or firefighters.[21] Nor do the figures presented address the third inquiry. No doubt, assessing the total number of calls in the county for each category requires examination of police, fire, and EMS records in conjunction with one another. We note that the percentages considered by the district court apparently included "medical assists" by firefighter units to EMS units. On remand, the parties may consider exclusively EMS responses to fires, crime scenes, riots, natural disasters and accidents. 29 C.F.R. Sec. 553.214(a)(2).
 
 D. The "Integral Part" Standard
 
 33
 Our decisions in O'Neal and Spires v. Ben Hill County, 980 F.2d 683 (11th Cir.1993), recognized that the integral part test presents an inquiry distinct from the substantially related standard. O'Neal, 980 F.2d at 676; Spires, 980 F.2d at 685. The "integral part" language arises in 29 C.F.R. Sec. 553.210(a), defining fire protection activities. After listing four criteria underpinning the fire protection employee label, the regulation provides that "the term would also include rescue and ambulance service personnel if such personnel form an integral part of the public agency's fire protection activities." 29 C.F.R. Sec. 553.210(a) (emphasis added). Similar language appears in Sec. 553.211(a) regarding law enforcement activities. Neither regulation provides guidance about what constitutes an integral part, nor have we interpreted the term or the precise relationship between the integral part and substantially related standards.
 
 
 34
 The district court did not engage in a separate integral part inquiry at all. Defendant suggests that the integral part test represents a standard that is distinct and applicable to the present facts. We leave it to the district court to analyze the relationship between the "substantially related" and "integral part" standards and their applicability to the present case.
 
 E. The Twenty Percent Rule
 
 35
 In O'Neal we disagreed with the district court conclusion that the 80/20% rule was inapplicable to ambulance and rescue workers. O'Neal, 980 F.2d at 680. In so doing, we specifically approved of the decision by the district court in the instant case, which concluded that the rule is applicable to EMS workers. Id. at 680-81. Accordingly, if the County proves its entitlement to a section 7(k) exemption, that exemption must survive scrutiny under the 20% rule as well.
 
 
 36
 We have previously implicitly imposed upon the employer the burden of showing that its exemption is not defeated by the 20% rule. Id. at 682 ("By superimposing the 80/20 rule [on the substantially related test], only those public agencies whose ambulance and rescue service employees spend a substantial amount (at least 80%) of their work hours in related activities are eligible for the section 7(k) exemption."). In keeping with the principle that exemptions from section 7(a) must be narrowly construed against the employer who also bears the burden of proof, O'Neal, 980 F.2d at 677, we now hold explicitly that to defeat an employee suit, the employer must demonstrate entitlement to an exemption under either the law enforcement or firefighter provisions, and also that the exempt employees work at least 80% of the time in related activities.
 
 
 37
 Categorizing activities as exempt or nonexempt is challenging. In the present case, defendants argue that all plaintiffs' time is spent in exempt activities. However, the record does not analyze the time plaintiffs spend awaiting calls and it appears that the court counted medical emergency dispatches as exempt activities. On remand, the district court is guided by our discussion in O'Neal, where we stated that station time spent awaiting calls is exempt except to the extent that the employer requires EMTs to perform tasks unrelated to fire protection or law enforcement, id. at 682, while "medical emergency hours" and time spent at accident scenes unrelated to automobiles are nonexempt. Id. at 681.
 
 
 38
 The consideration may also be informed by section 553.213(a), regarding public agency employees engaged in both fire protection and law enforcement activities:
 
 
 39
 [A]ll time spent in nonexempt activities by public safety officers within the work period, whether performed in connection with fire protection or law enforcement functions, or with neither, must be combined for purposes of the 20 percent limitation on nonexempt work discussed in Sec. 553.212.
 
 
 40
 29 C.F.R. Sec. 553.213(a) (1993) (emphasis added). We are aware that this section pertains specifically to "public safety officers," not to ambulance and rescue service employees. However, section 553.215 which applies to EMS personnel cross-references the public safety officer regulation; albeit, the cross-reference is to subsection (b), not to subsection (a). We leave it to the parties to develop on remand the possible implications of the statutory scheme.
 
 F. The Fourteen Dismissed Plaintiffs
 
 41
 Plaintiffs allege that the district court abused its discretion is dismissing fourteen plaintiffs from the suit as a sanction for violation of a discovery order.[22] This issue warrants further detailing of the procedural background.
 
 
 42
 On August 2, 1991, defendant served each plaintiff with interrogatories. Pursuant to an unopposed motion for extension of time, the court gave plaintiffs until October 2 to respond. On November 27, 1991, after some correspondence between counsel about the interrogatories, defendant moved for discovery sanctions. The court granted defendant's request, authorized attorney's fees for preparation of the motion, and directed plaintiffs to submit proper answers to interrogatories by January 31, 1992. The court warned that "[f]ailure to do so will result in dismissal of the cause of action as to those plaintiffs not responding properly." [Order of January 7, 1992, emphasis added.] The court offered no further elaboration of the term "properly." Thereafter, thirteen of the fourteen dismissed plaintiffs responded to the interrogatories. On February 10, 1992, defendant moved to dismiss pursuant to Fed.R.Civ.P. 37(b)(2)(C) based on plaintiffs' failure to comply with the discovery order by giving improper answers to interrogatories. Meanwhile, defendant deposed plaintiffs and received full answers to their questions. On March 24, 1992, the district court dismissed the plaintiffs, referring to its January 7th order, and noting plaintiffs' failure to object to the interrogatories despite the passage of six months and several warnings to properly respond.
 
 
 43
 One further order requires our attention. On July 16, 1992, the trial court ruled on defendant's motions to tax costs and fees. In that order, the court 1) awarded defendant $3,137.50 attorney's fees for preparation of the original motion for sanctions; 2) awarded deposition costs of $4,527.10 incurred because of plaintiffs' failure to timely and properly answer interrogatories; but 3) denied attorney's fees of $2881.25[23] for preparation of defendant's motion to dismiss for violation of the first discovery order. The court specifically noted that award of attorney's fees for work on the motion to dismiss did "not seem to be a proper sanction." [Order of July 16, 1992.]
 
 
 44
 Federal Rule of Civil Procedure 37(b)(2) provides in relevant part:
 
 
 45
 If a party ... fails to obey an order to provide or permit discovery ... the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:
 
 
 46
 ....
 
 
 47
 (C) An order ... dismissing the action or proceeding or any part thereof....
 
 
 48
 ....
 
 
 49
 In lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.
 
 
 50
 Sanctions allowed under Rule 37 are intended to 1) compensate the court and other parties for the added expense caused by discovery abuses, 2) compel discovery, 3) deter others from engaging in similar conduct, and 4) penalize the offending party or attorney. Carlucci v. Piper Aircraft Corp., 775 F.2d 1440, 1453 (11th Cir.1985); National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed.2d 747 (1976). The trial court's discretion regarding discovery sanctions is not unbridled. Pesaplastic, C.A., v. Cincinnati Milacron Co., 799 F.2d 1510, 1519 (11th Cir.1986). We have consistently held that while district courts have broad powers under the rules to impose sanctions for a party's failure to abide by court orders, dismissal is justified only in extreme circumstances and as a last resort. Malautea v. Suzuki Motor Co., 987 F.2d 1536, 1542 (11th Cir.) cert. denied, --- U.S. ----, 114 S.Ct. 181, 126 L.Ed.2d 140 (1993); Ford v. Fogarty Van Lines, Inc., 780 F.2d 1582, 1583 (11th Cir.1986); State Exchange Bank v. Hartline, 693 F.2d 1350, 1352 (11th Cir.1982).
 
 
 51
 Dismissal is warranted only where noncompliance with discovery orders is due to willful or bad faith disregard for those orders. Cox v. American Cast Iron Pipe Co., 784 F.2d 1546, 1556 (11th Cir.), cert. denied, 479 U.S. 883, 107 S.Ct. 274, 93 L.Ed.2d 250 (1986). While our review is sharply limited to search for an abuse of discretion and determination that the trial court's findings are supported by the record, we will find abuse of discretion if less drastic sanctions would suffice. Malautea, 987 F.2d at 1542; Navarro v. Cohan, 856 F.2d 141, 142 (11th Cir.1988); Pesaplastic, 799 F.2d at 1519.
 
 
 52
 We agree with plaintiffs that the district court abused its discretion by dismissing the fourteen plaintiffs who failed to respond properly to interrogatories. First, a lesser sanction was available. In its July 16, 1992 order, the trial court specifically noted that defendant requested the award of attorney's fees for preparation of the motion to dismiss pursuant to plaintiffs' violation of the discovery order. The court had already rejected this less drastic sanction and opted instead to dismiss. Cf. Navarro, 856 F.2d at 142 (affirming dismissal that took place only after other less drastic sanctions had failed). Second, the trial court made no specific finding of bad faith resistance to its discovery orders. See Beavers v. American Cast Iron Pipe Co., 852 F.2d 527, 528 (11th Cir.1988); Cox, 784 F.2d at 1556. Third, plaintiffs' noncompliance with the discovery order did not prejudice defendant. See Fogarty Van Lines, 780 F.2d at 1583. Defendant admitted in oral argument that it obtained proper or complete answers during plaintiffs' depositions. Defendant used these depositions in support of its successful motion for summary judgment. Furthermore, the court awarded deposition costs to defendant as part of the sanction.
 
 
 53
 While we believe the district court was justifiably frustrated by plaintiffs' apparent recalcitrance, we do not believe violation of the discovery orders arose to the sort of willfully contemptuous conduct warranting dismissal that we have affirmed in the past. See Malautea, Navarro, Pesaplastic, supra. This discussion in no way suggests our approval of plaintiffs' conduct. We have previously noted that:
 
 
 54
 The reversal of the dismissal with prejudice does not deprive the district court of the authority to impose lesser sanctions against the plaintiff, or disciplinary action against the attorney, if the Court decides such would be appropriate under the established law and the facts of this case.
 
 
 55
 Fogarty Van Lines, 780 F.2d at 1583. We are confident that the district court will elect appropriate sanctions, and that further discovery will be uncomplicated by negligent or intentional dilatoriness by counsel for either party.
 
 
 56
 For all the foregoing reasons we REVERSE the dismissal of fourteen plaintiffs, VACATE the order of summary judgment, and REMAND.
 
 
 
 [1]
 29 U.S.C. Secs. 201-219 (1988)
 
 
 [2]
 Because the "24-on/48-off" schedule does not easily equate to a typical forty hour work week, the County calendars both EMS personnel and firefighters on a twenty-one day work period. During a complete cycle, both sets of employees work 168 hours and are paid overtime for nine of those hours. If EMS personnel were awarded overtime after working forty-three hours per week, like police officers, they would be entitled to thirty-nine hours of overtime in each twenty-one day work period. If they were treated as non-exempt employees under section 7(a), plaintiffs would be entitled to forty-eight hours of overtime in each work period
 
 
 [3]
 Pursuant to Fla.Stat. Sec. 401.23(1) (1993), Advanced Life Support functions include administering drugs and intravenous fluids, and performing cardiac defibrillation
 
 
 [4]
 The term "medical assists" is not further explained. The EMS "Total Runs by Units" computer printout lists in excess of twenty types of calls that might be considered medical assists
 
 
 [5]
 The County points out that from 1989 through 1991, approximately 57% of all firefighter calls were joint responses with EMS personnel. This figure does not, without more, further the inquiry of whether EMS employees are more like firefighters or police officers, or are non-exempt personnel as they claim. Instead, it sheds light on the nature of the firefighter position
 
 
 [6]
 The computer printout on EMS calls places dispatches into forty-three categories. These categories do not match the fifty-two categories reflected on the firefighter printout. The parties' "battle over numbers" is in large part caused by disparities in the call classification schemes, neither of which exactly matches the statutory language at issue. By focusing exclusively on the EMS records, Plaintiffs suggest that when viewed in the light most favorable to the county, dual response during the three reported years occurred in approximately twenty-seven percent of all EMS calls, and when viewed in the light most favorable to plaintiffs, occurred in merely 3.6% of EMS dispatches
 
 
 [7]
 These EMS dispatches apparently fall into discrete medical assist categories including: abdominal pains, allergic reactions, amputations, aneurysm, asthma, back pain, cardiac, choking, stroke, diabetic, electrical shock, GI bleeds, head injuries, heat injuries, musculoskeletal, ob/gyn, poison, respiratory, seizures, and trauma. Although the parties did not address it, police officers may be routinely dispatched to many of these calls as well, on the theory that any professional trained in first aid might be able to provide help. All police officers in Florida receive a minimum of forty-two hours basic training in medical first responder, which includes C.P.R. certification. Florida Criminal Justice Standards and Training Commission Law Enforcement Basic Academy Curriculum, developed pursuant to Fla.Stat. Sec. 943.12(5) (1993)
 
 
 [8]
 29 U.S.C. Sec. 207(a)(1) (1988)
 
 
 [9]
 Fire protection activities are described at 29 C.F.R. Sec. 553.210(a) (1993)
 
 
 [10]
 Law enforcement activities are described at 29 C.F.R. Sec. 553.211(a) (1993)
 
 
 [11]
 29 C.F.R. Sec. 553.230(c) (1993)
 
 
 [12]
 29 C.F.R. Sec. 553.215(a) (1993) (emphasis added)
 
 
 [13]
 29 C.F.R. Sec. 553.215(a)
 
 
 [14]
 29 C.F.R. Secs. 553.210(a) and .211(b) (emphasis added)
 
 
 [15]
 29 C.F.R. Sec. 553.212(a) (1993). The rule applies to fire protection and law enforcement personnel as described in Secs. 553.210 and 553.211
 
 
 [16]
 29 C.F.R. Sec. 553.212(a)
 
 
 [17]
 This regulation cross-references section 553.213(b), which applies to personnel cross-trained as police officers and firefighters ("public safety officers"). The proper exemption category for ambulance and rescue personnel, like that for public safety officers, depends on the type of activity in which these employees spend most of their time
 
 
 [18]
 We note that the percentage of calls handled by EMS personnel with fire and police personnel is similar, i.e. 27.92% with firefighters and 22.03% with police officers. We will not speculate as to whether more time is required to assist at a multiple shooting than at a house fire where EMS personnel stand by in event of injuries
 
 
 [19]
 An obvious alternative explanation is that EMS employees represent an entirely separate professional category, and the statutory scheme inherently forces an awkward fit between discrete job classifications and functions. It is surprising that specific legislation has not been introduced to deal with EMS personnel as an autonomous group
 
 
 [20]
 The good faith defense arises in 29 U.S.C. Sec. 259 which provides that an employer is not subject to liability for the failure to pay overtime under the FLSA if:
 [H]e pleads and proves that the act or omission complained of was in good faith conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of [a specified] agency of the United States ..., or any administrative practice or enforcement policy of such agency with respect to the class of employers to which he belonged. Such a defense, if established, shall be a bar to the action or proceeding.... (emphasis added).
 
 
 [21]
 Quite possibly, a major structure fire would occupy several EMS units for many hours, while an automobile accident may be handled in a matter of minutes
 
 
 [22]
 Defendant asserted, without citation to rule or precedent, that the issue was waived because the order of dismissal was "final" as to these plaintiffs, and appeal was not taken within thirty days. (Appellee's Brief at p. 10, n. 1.) We find this argument spurious. Under Fed.R.Civ.P. 54(b), when multiple parties are involved the court may direct entry of final judgment as to one or more but fewer than all of the claims or parties "only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." The district court did not make these express findings; the time for appeal did not begin to run; and defendant's unsupported contention is totally meritless
 
 
 [23]
 This figure was not included in the order. We extract it from Defendant's Reply Memorandum in Support of its Motion for Attorney's Fees and Costs Incurred in Obtaining Order Dismissing Fourteen Plaintiffs, R6-106-4