**MASSACHUSETTS SCHOOL OF LAW AT ANDOVER, INC.**

v.

**AMERICAN BAR ASSOCIATION, et al.**

Civil Action No. 93–6206.

United States District Court, E.D. Pennsylvania.

Feb. 15, 1996.

**1173**

Barbara W. Mather, L. Suzanne Forbis, Pepper, Hamilton & Scheetz, Philadelphia, PA, David T. Pritikin, David R. Stewart, Sidley & Austin, Chicago, IL, Mark P. Edwards, Morgan, Lewis & Bockius, Philadelphia, PA, Robert A. Burgoyne, Fulbright & Jaworski, Washington, DC, Scott Stempel, Morgan, Lewis & Bockius, Washington, DC, for Defendants.

### OPINION AND ORDER

DITTER, District Judge.

In this case, a law school brought suit against the American Bar Association and other defendants after ABA denied the school's application for provisional accreditation. The school alleges that the defendants violated the Sherman Act by maintaining and enforcing anticompetitive standards.

The school refused to permit compliance with two discovery subpoenas despite three court orders to do so. For repeatedly frustrating legitimate discovery and disobeying court orders, I will order the school's attorney personally to reimburse ABA for its expenses incurred in responding to "Plaintiff's Motion For a Stay and For Reconsideration of the Court's Order Granting Defendant American Bar Association's Rule 37(b) Motion Seeking the Production of Documents." I will further order him to make a payment into the court for his lack of candor and his complete absence of good faith.

\*      \*      \*

In connection with its plan to obtain accreditation, plaintiff, Massachusetts School of Law, hired Ansel S. Chaplin, as its ABA consultant. Mr. Chaplin is an attorney, but apparently his principal service to MSL was recruiting seven New England lawyers who agreed to inspect MSL.[1] After they did so, MSL's dean, Lawrence Velvel, with Mr. Chaplin's help, wrote a laudatory report that these attorneys eventually signed. MSL obtained this report for the avowed purpose of using it to receive favorable treatment from

Lee M. Epstein, Anderson Kill Olick & Oshinsky, P.C., Philadelphia, PA, Kenneth M. Hart, James Capra, Donovan, Leisure Newton & Irvine, New York City, Lawrence R. Velvel, Michael L. Coyne, Andover, MA, for Plaintiff.

1. Plaintiff's dean characterized Mr. Chaplin's views on how the school should proceed to obtain accreditation as "naive and silly" and a second letter in which Mr. Chaplin described his proposals as "not quite as childish as the first." He would be kept as the school's consultant, however, because to drop him "would not look good and, to put it crassly, he does have his uses. If possible, we would like to keep him on to further those uses when opportunities present themselves." (Sanctions Hearing, 10/25/95, Ex. 3).

the ABA and to the extent it would be helpful or necessary, from other agencies, including the United States Department of Education. When the ABA refused provisional accreditation, MSL brought this suit and attached to the complaint the report that Messrs. Velvel and Chaplin had prepared for the lawyers.

During the course of discovery, the ABA subpoenaed Mr. Chaplin to produce his records and to submit to a deposition concerning his work for MSL. On instructions for which MSL's attorney, Kenneth N. Hart, Esq., acknowledges responsibility, Mr. Chaplin refused to produce many MSL related documents and to answer many questions at his deposition. Mr. Hart contended that the documents and deposition responses were protected by the attorney-client privilege. I ruled that the attorney-client privilege did not apply, but Mr. Hart instructed Mr. Chaplin still not to comply with ABA's request, contending that I erred when I overruled the attorney-client objection. Despite a second order to comply, Mr. Hart again instructed Mr. Chaplin not to produce the documents or give the testimony. He now asserted that I had neither directed the production of documents nor that Mr. Chaplin's deposition was to proceed when I entered the two orders. Finally, Mr. Hart instructed Mr. Chaplin not to comply because Mr. Hart said discovery had been stayed.

On October 12, 1995, I ordered plaintiff not to interfere in any way with Ansel Chaplin's answering questions and producing documents concerning his work as MSL's ABA consultant and scheduled a hearing for October 25, 1995, to determine whether sanctions should be imposed on Ansel S. Chaplin, plaintiff, or any of its counsel for their conduct relating to these events.[2]

1. The Responsibility of Kenneth N. Hart

■ Kenneth N. Hart, Esq., has been MSL's lead counsel in this litigation since August 2, 1994. As a threshold matter I note that at the sanctions hearing, Mr. Hart, who appeared *pro se,* stated:

whatever actions MSL might have taken or its representatives, Dean Velvel, Professor Rudnick or Professor Malaguti might have taken in response to the Court orders of June 27, August 16th, and September 20th of 1995, they were on my advice and my counsel.

Let it be clear that I am the accountable person for this, and I am the responsible person for this, your Honor.

(Sanctions Hearing, 10/25/95, at 23:9–16). Accordingly, as Mr. Hart avows that he is the only accountable person, my consideration has been limited to determining whether sanctions should be imposed upon him.

2. Mr. Hart's Own Words Disprove His Claim that He Was Acting in Good Faith

This discovery dispute started with two ordinary, straightforward subpoenas and an ordinary, straightforward order to comply with them.[3] Both of those subpoenas were directed to Ansel S. Chaplin and both stated in part, "YOU ARE HEREBY COMMANDED to produce and permit inspection and copying of the following documents ... All documents relating to the Massachusetts School of Law." MSL claimed the protection of the attorney-client privilege, however, and at its instruction, Mr. Chaplin did not produce many of the documents covered by the subpoenas. He also did not fully answer more than 70 questions at his deposition based on the privilege.

ABA filed a motion "to compel the production of documents and testimony from non-party Ansel S. Chaplin, in compliance with document subpoena served on August 16, 1994, and a subpoena seeking documents and testimony served September 13, 1994." (Defs.' Mot. to Compel Compliance with Subpoena [hereinafter "Defs.' Mot. to Compel"] ). Just as the subpoenas were straightforward and in plain English, so too was the ABA's motion to compel.

---

**2.** After my order of October 12, 1995, MSL permitted Mr. Chaplin to produce the documents.

**3.** ABA served its first subpoena on Mr. Chaplin on August 16, 1994, and its second on September 13, 1994.

In opposing that motion, Mr. Hart stated explicitly his understanding of what the ABA wanted: "they seek to compel [Chaplin] to produce further testimony and documents ... the ABA does not ask the Court to make specific rulings on particular questions Mr. Chaplin refused to answer ... [ABA] seeks a sweeping order that the attorney-client privilege and work product immunity protect nothing that Mr. Chaplin could possibly say in a subsequent deposition." (Opp'n of Pl. to Mot. of Deft. ABA to Compel Compliance with Subpoena, at 1 [hereinafter "Pl.'s Opp'n to Mot. to Compel"]). Mr. Hart concluded his opposition to ABA's motion by saying "the ABA's motion to compel compliance with subpoena should be denied." (Pl.'s Opp'n to Mot. to Compel, at 14).

Mr. Hart had summarized the motion and subpoenas correctly. My order of June 27, 1995, granted ABA's motion "to compel compliance with subpoena" and explained why "MSL had waived its privilege and that discovery sought by the ABA's subpoena to Ansel Chaplin was to be compelled...." (Pl.'s Mot. for Recons. of this Ct.'s Decision and Order Directing Discovery of its Privileged Attorney–Client Communications on Grounds of Waiver, at 1 [hereinafter "Pl.'s Motion for Recons."]). There was no ambiguity, obscure language, or room for misunderstanding in the order. When it is read in the light of the subpoenas, there is only one possible meaning: Mr. Chaplin was "to produce and permit inspection and copying of ... All documents relating to the Massachusetts School of Law." Mr. Hart never suggested when I issued the order that he did not understand what I meant when I said that the motion to compel was granted. To the contrary, his own words show that he knew exactly what the order required. In his motion for reconsideration of my order of June 27, 1995, granting ABA's motion "to compel compliance with subpoena," Mr. Hart argued that I erred in "granting the motion of the American Bar Association to compel the production of documents and testimony from Ansel B. Chaplin, Esq." (Pl.'s Motion for Recons., at 1).

On August 3, 1995, Mr. Hart reaffirmed that he understood my order when he filed "Plaintiff's Reply In Further Support of Its Motion for Reconsideration of This Court's Order Directing Discovery of Privileged Attorney–Client Communications on Grounds of Waiver." (Document 220). Not only did the title of this document accurately describe my order of June 27, 1995,[4] but in its opening paragraph, Mr. Hart correctly characterized that order as "granting, on grounds of waiver, the ABA's motion to compel the production of documents and testimony from Ansel B. Chaplin, Esq." In a nine-page memorandum dated August 14, 1995, I ruled on MSL's motion for reconsideration and explained why I was affirming my order of June 27, 1995, which had granted ABA's motion to compel compliance with its subpoenas.

At Mr. Hart's instruction, however, Mr. Chaplin again failed to comply, and ABA filed a motion to stop MSL's interfering with his doing so. On September 20, 1995, I granted that motion. On September 27, 1995, based on two new contentions, that is, discovery had been stayed since March 1, 1995, and that before my order of September 20, 1995, I had never directed the production of documents, I was asked to reconsider and stay that order. (Pl.'s Mot. for a Stay and for Recons. of the Ct.'s Order Granting Def. ABA's Rule 37(b) Mot. Seeking the Production of Documents [hereinafter "Pl.'s Mot. for a Stay"]). In this motion, Mr. Hart stated that he believed neither my order of June 27, 1995, nor my order of August 16, 1995, "direct[ed] MSL or Mr. Chaplin to produce documents or provide testimony." (Pl.'s Mot. for a Stay, at 3). To this point, there had been no assertion that the subpoenas of August 16, 1994, and September 15, 1994, were ambiguous, or that MSL believed ABA was seeking and I was giving an academic answer to a theoretical question about the attorney-client privilege. Mr. Hart maintains, however, that my orders, which had granted ABA's motions to compel compliance

---

**4.** To direct is defined as meaning "to give an order or instruction." *Webster's New International Dictionary* (2d ed. 1961). Thus, as the title of Mr. Hart's motion for reconsideration shows

he understood my order *"directing discovery,"* to mean I was ordering, I was instructing, it to take place.

with its subpoenas, did not compel the production of documents or the giving of testimony. Although he asserts that he entertained this belief in good faith, the clarity of the subpoenas, the clarity of my orders, and most of all, the clarity of Mr. Hart's own responses show that he knew precisely what ABA sought and exactly what I had ordered MSL and Mr. Chaplin to do.

In defiance of his own words from three separate pleadings, however, Mr. Hart stood in front of me on October 25 and repeated his claim that in good faith he did not believe I had ordered the production of documents and Chaplin's testimonial responses until September 20, 1995. This is what he said:

> In my view, your Honor, neither this Court's order of June 27th, 1995 or August 16, 1995 affirmatively directed that document discovery or deposition testimony was to proceed.
>
> The ABA's motion made in the fall of 1994 sought an order overruling MSL's privilege objections. We read that and I thought your Honor read that as a request for a ruling. . . . It was a broad-sweeping request that there should be no privilege attached here but in any event, that was the relief that was requested in the ABA's order.[5]
>
> And by this Court's June 27th, 1995 order, the Court granted the ABA's motion and overruled the privilege objections. In its order of August 16th, 1995, which reaffirmed the June 27th order, did the same thing.[6]
>
> Neither order as I read them at the time and in good faith directed the production

of documents or that the deposition of Mr. Chaplin was to proceed.

(Sanctions Hearing, 10/25/95, at 27:13–28:6).

Just how Mr. Hart could even make this argument on October 25 1995, when he had said on July 11, 1995, and again on August 3, 1995, that I should reconsider my order of June 27, 1995, "granting the motion of the American Bar Association to compel the production of documents and testimony from Ansel B. Chaplin, Esq." is completely beyond me. In any event, I reject Mr. Hart's claim of good faith in misunderstanding my orders of June 27, 1995, and August 16, 1995 for two reasons: (1) the subpoenas and my orders are clear and precise; and, (2) Mr. Hart's own documents show he knew exactly what they meant.

### 3. If Mr. Hart Believed Discovery Had Been Stayed, He Should Have Said So

Mr. Hart also contended that he was justified on August 31, 1995, in telling Mr. Chaplin not to comply with my orders because he believed that discovery had been stayed since March 1, 1995. (Pl's Mot. for a Stay, at 6–7; Sanctions Hearing, 10/25/95, at 26–27).

Mr. Hart bases this contention on a letter of mine dated March 1, 1995. This is what that letter said:

> Dear Mr. Hart:
>
> I have approved the stipulation of counsel for the ABA and for the Massachusetts School of Law to extend the time for response to the motion for summary judgment until March 24, 1995. I can see no point in meeting with counsel until after the motion of the ABA for summary judgment is resolved.

---

**5.** Although it is true that on the last page of the ABA's motion to compel, it stated, "ABA requests the Court to . . . overrule MSL's privilege and work-product objections to the testimony and documents of Mr. Chaplin responsive to the ABA's subpoena," Mr. Hart is taking this language out of context to contend now that ABA never requested actual production but instead only sought a ruling on an abstract question. Indeed, the ABA requested that MSL's assertion of privilege—the single obstacle to compliance with its subpoenas—be overruled. If relief had been granted in those terms, the only thing left would have been the subpoenas which *commanded* the production of documents and the giving of

testimony. This is especially clear in light of the surrounding circumstances as indicated by Mr. Hart's own words in his pleadings.

**6.** Neither order used any such language or conveyed any such meaning. My first order said, "AND NOW, this 27th day of June, 1995, defendant American Bar Association's motion to compel compliance with subpoena is granted." The second order said, "AND NOW, this 16th day of August, 1995, plaintiff's motion for reconsideration of my order of June 27, 1995, is hereby granted and, after reconsideration, the June 27, 1995 order is hereby affirmed."

My letter was in response to a long letter from Mr. Hart in which he argued that the ABA's recently-filed motion for summary judgment was premature, contended that discovery was not yet complete, and asked for a scheduling conference, and ABA's answer to him that a summary judgment motion can be filed at any time.

How Mr. Hart concluded from the three letters in question, none of which said one word about a stay of discovery, that discovery had been stayed he explained in this way:

> And I can say it was my understanding at that time as a result of the Court's March 1st, 1995 letter, and in light of this Court's prior orders, including its decision order May 20, 1994,[7] that the Court was saying it would not permit any further discovery except upon further order of the Court after disposition of the pending motion for summary judgment.

> From that point on, your Honor, I was of the very firm view and understanding that [except] upon express orders of this court directing a production of documents at depositions or other discovery, the discovery had been stayed. And I think, your Honor, the fact that no discovery at all to speak of proceeded in this case for over a year so (sic), it demonstrates that I was not alone in that view.

(Sanctions Hearing, 10/25/95, at 26:25–27:12).

From March 1, 1995, the date of my letter that Mr. Hart says he read to order a stay of discovery, until October 25, 1995, when Mr. Hart made this comment, is not a year, much less over a year. However Mr. Hart's arithmetic exaggeration is not important—what matters is that if he was of the "very firm view and understanding" that discovery had been stayed he should have said so when he received my June 27 order. If he was of the "very firm view and understanding" that discovery had been stayed, he should have said so when, on July 11, 1995, he asked me to reconsider my order of June 27. If he was of the "very firm view and understanding" that discovery had been stayed, he should have said so on August 3, 1995, when he filed his reply in further support of his motion for reconsideration of my order of June 27.

■ It is not good faith for a lawyer to frustrate discovery requests and court orders with successive objections like a magician pulling another and another and then still another rabbit out of a hat. Mr. Hart's failure to state his "very firm view and understanding" that discovery had been stayed since March 1, 1995, has caused delay, expense, and extra work. The firmer the view and the more complete the understanding, the greater was his duty to speak at the first opportunity.

There is one more thing with regard to Mr. Hart's very firm view, understanding, and representation that "there have been *no* discovery proceedings in this case," (Pl.'s Mot. for a Stay, at 5) (emphasis added):[8] contrary to what Mr. Hart said, there had been other discovery proceedings in this case after March 1, 1995. On June 27, 1995, the same day that I granted ABA's motion to compel compliance with subpoena, I granted a motion from the Association of American Law Schools and ordered MSL to produce documents. Although both orders (the one granting ABA's motion to compel and the other granting AALS' motion) were dated the same day, they yielded different results: while Mr. Hart provided three boxes of documents to AALS, when it came to ABA's request, Mr. Hart refused because he had a "very firm view and understanding" that discovery had been stayed since March 1, 1995. Obviously Mr. Hart undermined his "good faith" claim that discovery was stayed by his own actions.

### 4. Failure to Provide a Privilege Log in Compliance with Fed.R.Civ.P. 45(d)(2)

■ At the sanctions hearing, James J. Capra, Mr. Hart's partner, spoke on behalf of two MSL professors who had appeared for

---

7. Neither that order, nor any other order I have entered in this case stayed discovery. Although some orders directed discovery and others temporarily limited certain discovery, none contained a blanket stay.

8. At the sanctions hearing, Mr. Hart amended this statement slightly by saying there had been "no discovery at all to speak of." (Sanctions Hearing, 10/27/95, at 27:10).

MSL when the ABA attempted to take Mr. Chaplin's deposition. Where Mr. Hart contended he thought the subpoenas, motions, responses, replies, and orders were all in pursuit of an answer to a theoretical question about the attorney-client privilege, Mr. Capra emphasized mechanics. His justification for MSL's refusal to comply with my orders was based on the ABA's failure to be specific enough in its motions. "[W]e operated," so he said, "on the basis that the American Bar Association had never moved for an order directing the production of documents by a certain date. They had not moved for an order compelling answers to specific questions that had been asked at the deposition and to which objections had been interposed." (Sanctions Hearing, 10/25/95, at 19:23–20:4).

Although related to Mr. Hart's contention that ABA had only requested a ruling on the abstract question of privilege, Mr. Capra's argument shifted the emphasis from *what* ABA sought to *how* things were sought. In effect, Mr. Capra raised a new objection [9] never made in any of Mr. Hart's pleadings and apparently saved by Messrs. Hart and Capra for the proverbial rainy day. As previously noted, a lawyer does not act in good faith when he tries to justify ignoring discovery requests and court orders with an objection which, to that point, he has kept to himself. Discovery is not poker where the cards are turned up one at a time.

Messrs. Capra's and Hart's assertions that they "operated" on the basis that ABA had never requested that I compel the production of specific documents might appear in a better light had they complied with Federal Rule of Civil Procedure 45(d)(2). This rule

requires a party who withholds subpoenaed information on the grounds of privilege to make the claim "expressly" and to "describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection." [10]

■ When I asked if MSL had complied with the rule, Mr. Capra admitted that no privilege log had ever been provided. (Sanctions Hearing, 10/25/95, at 9). However, he maintained that MSL was not required to do so because the ABA knew it was MSL's position that Mr. Chaplin was "providing legal services, was acting as a lawyer for MSL." (Sanctions Hearing, 10/25/95, at 10). Mr. Capra is wrong. A general objection is insufficient. The purpose of the rule is to provide a party whose discovery is constrained by a claim of privilege with information sufficient to evaluate the claim and to resist it. The party claiming the privilege cannot decide the limits of his entitlement. A person who fails to provide adequate information about the privilege to the party seeking the information may be held in contempt or be subjected to sanctions. Fed.R.Civ.P. 45 advisory committee's note (1991); 45 U.S.C.A. §§ 404–05. Moreover, failure to assert a privilege properly may amount to a waiver of that privilege. *See Eureka Fin. Corp. v. Hartford Accident & Indem. Co.,* 136 F.R.D. 179, 183–84 (E.D.Cal.1991). It follows that a party who alleges privilege as a reason for not complying with a subpoena has the burden of proof to assert specific facts relating to specific documents and cannot rely on conclusory statements.

**9.** At the sanctions hearing, Mr. Capra correctly stated that "we had pointed this out;" *i.e.,* pointed out in the past MSL's belief that ABA had not made specific requests. (Sanctions Hearing, 10/25/95, at 20:4). In MSL's original opposition to the ABA's motion to compel, it noted that "ABA does not ask the Court to make specific rulings on particular questions Mr. Chaplin refused to answer during his deposition...." (Pl.'s Opp'n to Mot. to Compel, at 1). However, although MSL had "pointed out" its belief that ABA's requests were not specific, this had never been its basis for interfering with Mr. Chaplin's compliance with ABA's subpoenas. MSL had interfered with compliance because, it argued,

Mr. Chaplin was acting as a lawyer while working for MSL, (Pl.'s Opp'n to Mot. to Compel, at 2), the privilege had never been waived, (Pl.'s Mot. for Recons., at 1), discovery had been stayed, (Pl.'s Mot. for a Stay, at 5), and I had never ordered production, (Pl.'s Mot. for a Stay, at 3), but it never argued that ABA's requests were not specific.

**10.** Fed.R.Civ.P. 26(b)(5) uses the same words as those in Rule 45(d)(2) to describe what must be done when documents are not produced in response to discovery requests.

■ Mr. Capra contended he and Mr. Hart believed in good faith that my orders granting ABA's motion to compel compliance with its subpoenas did not require them to produce specific documents because neither ABA's motion nor my orders identified specific documents. Without a privilege log, however, obviously there was no way ABA could specifically identify any document. Messrs. Hart and Capra have put the saddle on the wrong horse. Their failure to provide a privilege log made any expectation of specificity from ABA unreasonable, factually impossible, and legally frivolous. Thus, although I do not reach the question of whether MSL's failure to provide a privilege log amounted to a total waiver of the attorney-client privilege, I do find that in failing to provide the log, MSL waived its right later to question the specificity of ABA's document requests, ABA's motions to compel, and my orders granting those motions. A lawyer cannot rely on his own disregard for the rules of civil procedure to justify his further misconduct.

### 5. Sanctions Are Imposed on Kenneth N. Hart Personally

■ Federal Rule of Civil Procedure 37(b)(2) provides that "[i]f a party ... fails to obey an order to ... permit discovery ... the court in which the action is pending may make such orders in regard to the failure as are just...." Rule 37 sanctions can include both attorney's fees and fines levied against a party, an attorney, or both. Fed.R.Civ.P. 37(a)(4) (mandatory attorney's fees when motion to compel granted and opposition not substantially justified); *Pereira v. Narragansett Fishing Corp.*, 135 F.R.D. 24, 26–27 (D.Mass.1991) ("may make such orders in regard to the failure as are just" empowers courts to levy fines). Sanctions allowed un-der Rule 37 are intended to: 1) compensate the court and other parties for the added expenses caused by discovery abuses; 2) compel discovery; 3) deter others from engaging in similar conduct, and 4) penalize the offending attorney. *Wouters v. Martin County*, 9 F.3d 924, 933 (11th Cir.1993), *cert. denied*, —— U.S. ——, 115 S.Ct. 65, 130 L.Ed.2d 21 (1994).[11] Finally, courts possess an independent, inherent power to discipline attorneys who appear before it. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S.Ct. 2123, 2132, 115 L.Ed.2d 27 (1991). Courts can exercise this inherent power to impose sanctions where an attorney behaves vexatiously. As part of its inherent power, a court has wide latitude in fashioning an appropriate remedy. *Id.* at 45–46, 111 S.Ct. at 2133–34.

Mr. Hart closed his comments to me at the sanctions hearing in the same vein in which he had begun:

> And I think I can say without any reservation that I made those decisions and judgments. And I take full responsibility for them, and I'm accountable for them. And what MSL did, your Honor, and what Dean Velvel did and Connie Rudnick did and Peter Malaguti did was pursuant to my advice and counsel as their lead attorney in this matter.

(Sanctions Hearing, 30:13–18).

I am not imposing sanctions on Mr. Hart for initially opposing ABA's motion "to Compel Compliance with Subpoena"[12] or for his subsequent motion for reconsideration of my order granting ABA's motion "to Compel Compliance with Subpoena," but rather for his subsequent, intentional, inexcusable conduct and the conduct of others for whom he has claimed responsibility.[13]

Because Mr. Hart is solely responsible, he and he alone should pay the sanctions I am

---

**11.** Although I am proceeding under the provisions of Rule 37, Section 1927 of Title 28 provides that "Any attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorney's fees reasonably incurred because of such conduct."

**12.** Mr. Capra tried to get into the record the idea that I was considering sanctions because of the initial assertion of attorney-client privilege.

(Sanctions Hearing, 12:18; 13:13; 18:12; 18:25). No doubt he had in mind *Securities & Exch. Comm'n v. Graystone Nash, Inc.*, 25 F.3d 187, 190–91 (3d Cir.1994).

**13.** For example, although Mr. Velvel actually told Mr. Chaplin not to comply with the subpoenas, Mr. Hart claims he instructed Mr. Velvel to contact Mr. Chaplin with the news of the alleged discovery stay.

imposing. He is to pay them personally. *See Landon v. Hunt,* 977 F.2d 829, 832 (3d Cir.1992) (sanctions can properly be imposed on attorney personally); *Carter v. Albert Einstein Med. Ctr.,* 804 F.2d 805 (3d Cir. 1986). That means he is not to accept any payment, reimbursement, or contribution from MSL, its faculty, administrators, trustees, supporters, or donors. The sanctions are to come from Mr. Hart's own money. He is not to accept any aid, assistance, or help in making payment. Mr. Hart is to be the source of the funds: not the client, not its employees, owners, or students; not his own law firm, his partners, his associates, or any insurance carrier.

ABA's attorney Barbara Mather has filed a sworn affidavit affirming that she and her co-counsel incurred expenses in the amount of $4,232 in responding to MSL's motion for reconsideration of my order of September 20, 1995.[14] MSL does not challenge the reasonableness of these expenses. (Sanctions Hearing, at 33:8–9). Based on the facts set forth in this opinion, Fed.R.Civ.P. 37, 28 U.S.C. § 1927, and the inherent power of this court, I find that Mr. Hart should bear the costs of ABA's opposition to MSL's motion for reconsideration of my order of September 20, 1995. Moreover, Mr. Hart should personally be fined an additional $4,232 because of the unreasonable contentions in his motion papers and at the hearing held on October 25, 1995.

An appropriate order follows.

### *ORDER*

AND NOW, this day of February, 1996, Kenneth N. Hart, Esquire, is hereby ordered:

1. to pay $3,260 personally to the law firm of Sidley & Austin;

2. to pay $972 personally to the law firm of Pepper, Hamilton & Scheetz; and,

3. to pay $4,232 personally to the Clerk of the United States District Court for the Eastern District of Pennsylvania.

14. ABA has not sought attorney's fees for the expenses it incurred in filing its motion to seek compliance with the June 27, 1995, and August

It is further ordered that in view of the fact that Mr. Chaplin, Mr. Malaguti, Ms. Rudnick, Mr. Velvel, and Mr. Capra were all acting at Mr. Hart's behest, none of them will be required to pay any sanction nor will MSL.

16, 1995, orders. Nor has it sought costs for the time its attorneys spent at the sanctions hearing.